Appellants in this case, discussions with counsel for the insured appellant. It's been agreed that I would take the labor in order in oral argument. And if Mr. Russicow, who represents the insured, desires to say something, he will do so during rebuttal. If that is what you're speaking to that, you know, do you hear back there? Yeah, let's speak a little. I shall. I shall. That may be some of your clients. I can only hope. Your Honor, this is a case that turns entirely upon a question of fairness, openness and timeliness in the dealing of an insurance carrier with its insured. And this issue spanned the entire time of the insurer insured relationship between Nautilus and Worldwide Eros. It started from the inception, obviously, and went through and went through to the time of the post tender communications with the insured. The record is undisputed that there is no point until January of 2003 that the insured received any notice that what it thought would be a post delivery exclusion would be applied to pre-delivery ongoing contractual obligations that it was fulfilling for its client. There have been a couple of cases that have come down recently that are important, I think, for the court's consideration, because we're dealing with not only the interpretation of insurance policies and how one should interpret them, but also in particular exclusions in those insurance policies. But also we're dealing with questions of estoppel. And the case that I'd like to bring to the court's attention came down in the latter part of this year from the California Supreme Court is Haynes versus Farmer's Insurance Exchange, 32 Cal 4th 1198. Now, Haynes dealt with the question of how one is to interpret an exclusion that is presented to the insured within the context of an endorsement. And that is precisely what we have in this case about the facts of the underlying facts of the case of the folks in the audience. OK, some idea. You know, I have to tell you this. I was looking at you for some time and I thought that you were one of my former law clerks. And, you know, the longer I looked at you, the more convinced I became because of your white shirt, the way your hair is parted and combed and which convinces me of the inherent unreliability of eyewitness identification. I didn't have that privilege, Your Honor. The hairstyle and the shirt, I have to give credit to my wife. Thank you, Your Honor. Hope I did a good job for you. Yeah. So help tell the folks what. Let's not charge his time. Now, we charge your time. No, I just stopped the clock very, very briefly. Don't worry about it. Yeah, I have the privilege of representing in a case that's not in federal court, which is where we're at now, but rather in state court. A widow and her daughter, the widow and the daughter became that, as you can read from the father and the husband, in the course of an accident that happened at an airport. The accident happened during the course of landing and takeoff exercises of an experimental airship or blimp, something that you would see if you look over the Coliseum sometimes, mid-year, et cetera. In this particular case, the airship was coming down not over grass, but rather over concrete, and crews were running up to grab the lines that fall down along the side of the airship itself. During the course of this, because people were running very quickly after a rather large object, one of the crew member, Dean Norsworthy, tripped, fell, and unfortunately sustained fatal injuries. So, in the case that I'm representing the family in, in the Superior Court, we are speaking to the compensation for the widow and for her daughter for the death of Dean Norsworthy, father and husband, in my context. We're now up here in the Federal Court on questions of whether or not an insurance policy provides coverage for the company that designed the blimp and was training the individuals who were chasing after the blimp. So we started out in the District Court, Federal District Court, and now we're up in the Court of Appeal, addressing issues now of contract interpretation. All right, that's fine, that's fine, that's a good opening statement. Since you've had that opportunity, I can only hope you're not zeroing in a little bit. When your client got this insurance, it was asked, does the applicant install, service, or demonstrate products? And the answer was no. Is that right? There was, in the application, a mistake in terms of what was... What do you mean a mistake? Well, that was what they said. We don't do this. That was what the agent who prepared the application said. The agent was an error. And the record is very clear that the insured gave the agent, and I know that the insured is chargeable with the agent's mistake, but the insured gave the agent a letter that specifically described its operations. And that is located in the transcript at pages 395 and 396. But it did affect the premium price. It did affect the premium price. You would not be able to get, I don't think, a policy for $2,500 that would insure the manufacturing process of a dirigible. Well, and if we're taking a look and we're asking questions as to whether there was a material misrepresentation, I would refer the court to an opinion that I'm sure Judge Thomas is quite well aware of, the Meiling opinion. So we can take a look, and was there a material misrepresentation? No, but would you answer the question, $2,500 was a very cheap amount to pay if you were getting the coverage you're claiming. That is correct. But the policy is subject to audit. Specifically within the terms of the policy itself, as in the Meiling opinion, the price charged in the beginning was nothing more than a down payment, and I think that's specifically the terms that is used in the policy. And it is subject to audit at the end of whatever policy period there may be. Was any more paid? There was nothing more paid, nothing more was asked for, notwithstanding the fact that this insurer knew in January of 2000 that Worldwide Aeros unquestionably was dealing with airships. We know that because there was a long investigation. They were making them, but were they servicing them? They were not servicing them even here. This was not a service situation. The airship had not been transferred or delivered to the possession of you. That's your position, but I would read it just the other way. It was delivered. Well, it could not be. Who owned the hangar where it was? At the time of this accident, it was being leased by Airship USA. However, it was still subject to coverage under this policy, and $300,000 worth of coverage was being afforded to Worldwide Aeros because Worldwide Aeros was still using this hangar. And the terms of the policy by way of the endorsement that extends the coverage to manufacturing operations speaks of simply just operations that are ongoing on its shared premises, and this is one of the operations that was ongoing. It was the training, and again, the district court. Well, you agree that your client did not own the premises. I would agree. My client does not own the premises. I'll lease them. It did not at that time lease it. It did, however. Was there an exclusion then? There was not an exclusion that would apply to that. No, Your Honor. It would not because it was still by virtue of the use of the terminology operations, there was still coverage afforded, and even the district court recognized that there was coverage afforded for this particular incident under the terms of the policy. The coverage was subject to an exclusion that the court found applicable, which was the products completed operations exclusion. That was the exclusion that was belatedly sent. Well, we don't have to get to that. We can do it earlier. Well, no, I don't believe that's correct because the coverage afforded on the policy is for manufacturing operations. It is not simply with respect to a particular premises. It speaks of operations arising out of particular locations, and this is most definitely the training of this crew, which is really at the nub of the underlying allegations. The training was ongoing and was not completed, and that's the uncontroverted testimony was set forth not only by the insured, but also by the customer in a declaration from the customer that acknowledged, yes, it was not delivered under the terms of the contract because the FAA would not allow it to be delivered, and the contract was not. The FAA wouldn't give legal title, but it was physically delivered. It gave legal title, but it was not unfettered delivery to the customer. Most people think of delivery as you hand something over. It's delivery. I would agree. Most people think of it as being I get something, I can do whatever I want with it. That's not what happened here, because the FAA required that World Wide Aero still retain some control over that particular airship, and the airship itself, again, we don't need to talk about products. Let's talk about what was really being done there because this is not a product case per se. It is a case of a failure to provide adequate training on what to do as a member of the ground crew, and what was still ongoing was the training. What was still not delivered was the manual, and under neither of those scenarios was there any instruction or information given that those on the ground crew should be wearing protective helmets. It was not until after this accident that the ground handling manual was produced and given over to the customer that within that manual, there is the recommendation and direction that helmets be worn. Had helmets been worn, there is testimony in the underlying case that this accident would not have been a fatal one. So, again, the error of the district court I would respectfully submit was in focusing on the airship. However, it is just almost as if we're taking a look at the Ohio casualty case that I cite in the brief when we're talking about exceptions. In the Ohio casualty case, we're talking about a person who was on a boat and was jumping off of the boat, jumped into a shallow area, and injured himself. There was an exclusion in there for activities involving a watercraft. There's a watercraft exclusion, just as there is an aircraft exclusion here. But what the court in Ohio casualty said is, But that watercraft was not involved in a negligent fashion in the injury-producing accident. What was involved was something prior to that, a negligence in supervision, which allowed this accident to happen. So, too, the blimp. There was nothing negligent about the operation of the blimp. There was nothing defective in the operation of the blimp. We know that now. When the complaint was filed, I did not know that. There was a possibility there could have been some defect in the controls, some difficulty in the propeller that was ultimately found not to be the case. The difficulty in this case related to the training that was being received by the ground crew. Training is manufacturing. I say training is part of the contract, which is part of the operations that was being performed by the insured. And that's where this case differs from the cases such as Bowers, the other out-of-state case that's cited in the brief, because there was no ongoing contractual performance. There, there was no question but that everything that was called for in the agreement between the parties had been completed. And the only in one case, I think they talked about subsequent servicing or correction. That's not the case we find ourselves in. What we find ourselves is a smack dab in the middle of an executory contract, so to speak. Performance was ongoing and was not completed. If you want to look at delivery of the pertinent issue and whether it was delivered or physically handed over, we can look at the ground handling manual. There's no question but that that was never delivered. That was never in the physical possession of the insured prior to this loss. And that, along with the instructional training, is that is the gravamen of the underlying case. So when would this airship have been delivered in your mind? The delivery of the airship, there was a date set forth in the agreement between the parties. That date had long passed because there had been an accident involved in that same airship before, et cetera. The delivery of the airship was explicitly contingent upon FAA approval, upon the FAA reviewing the ICAWs and then giving approval for that. Delivery I don't think ever occurred in this case because I don't think that there was ever approval. I would defer to Mr. Russicow, but it certainly had not occurred as of the time of this incident. Certainly training had not been completed, so the contract was still open, still needed to be taken care of and was in the process of being taken care of. Your sidekick is going to speak as well. Well, I'm not sure whether he will. If the court has any questions. If I could, then I think our brief talks at length about the exclusion, about the proper interpretation of the exclusion, about how the exception to the exclusion really is the one that should. Before you get into that, the broker that got the insurance, who was he working for? There was a broker, which is R.L. Chase. The broker would have been, if memory serves me correctly, the agent of Nautilus. There was an independent agent who was our agent, which was not our agent. It was the insurance agent, which was Robert Matheson. There was also an attorney who was involved that was sending information to Mr. Matheson, who was filling out the application. All right, well, who was the broker that is referred to in the appellee's brief that testified that Worldwide's operations solely involved the manufacture of advertising balloons? That was Mr. Matheson, and the record that I cited you to undercuts that completely. There is no question but that Mr. Matheson had in his possession before the application to Nautilus information concerning the manufacture of airships. And who was Mr. Matheson working for? He was working for, unfortunately, the insured Worldwide Airways. Pardon me? He was your agent? He was Worldwide Airways' agent, yes. And he makes that statement. He was wrong, but he made it. He made it, and that's why I say, when you look at us, that's fine. It would be the insured would be accountable for the neglect of the agent. But then what I think we have to look at is, under the Myling case, was the mistake, and I'll call it a mistake because it wasn't, notwithstanding what may be argued by counsel, it wasn't a fraud by the insured himself, but was the mistake material? And that's where we take a look at, would it have had a bearing on whether this insurance would have issued? Well, counsel would say, well, absolutely, and they have declarations that say, well, sure, we wouldn't have issued insurance on this. But the record reflects something differently, because when they unquestionably knew in January of 2000 that airships were involved, there was no objection. There was no rescission of the policy. There was no flight cancellation. There was a payment of that loss to the tune of somewhere on the order of $75,000, plus continuing to accept premiums from that point on. So we know that manufacture of airships was not a risk with respect to which Nautilus was averse. The next question is, would it have had an impact on the premium? Obvious answer to that was, well, certainly. But as in Myling, the insurance company had the opportunity to go back and had the right to go back and audit and look at what was paid prior. Your broker told them it's manufacturing. Of course, that's what they accepted. There wasn't any surprise there. Manufacturing meant manufacturing. It didn't mean a whole lot of other operations. Anyway, you see the point. You have a difficulty there. Let's leave it at that. Well, let me merely say. It's a serious difficulty, but let's leave it at that. Okay, that's fine, but let me merely point out that that representation was made in December of 1999. The end of December 1999. The blimp accident that was paid off was January of 2000. The fact that they were over generous is not a reason to go ahead. But it misleads the insured. At that point, if the insured knew that this was not the type of coverage that would be available to him, he could have gotten other coverage. So that's where the harm comes to the insured. And that's where we look at the cases that I've talked about, Sprague, Golden, Bowers and Neufeld. When we're talking about insurers being stopped to raise issues that you do not timely raise. Absolutely. We have a stop on this case. And there's a new case on that. It's Doheny Park. Doheny rather versus Park Terrace. One thirty two. Calab fourth. One zero seven six. And they all these cases, the Sprague, Golden, Bowers, Neufeld and Doheny, all speak of the import of the insurance company's statutory obligation to advise it's insured. They distinguish Waller by saying, well, in Waller, we were talking that Waller court wasn't talking about the obligation under insurance code section seven ninety point oh three H. And the code of regulation section two six nine two six nine five point four A, which puts the onus on the insurance carrier to advise it's insured. And these cases that I just cited to you all stand for the proposition is under those circumstances. When the insurer does not timely inform it's insured about important policy consequences, it would be held to be a stop from raising. And here the insurance company knew certainly as early as January of 2000 that we're dealing with an entity, the entity that is is manufacturing airships. It knew from the tender of the complaint in mid 2001 that it was being called upon to cover not only a product's claim pertaining to the airship, but also claims explicitly in the complaint that deal with the training of the crewman. And yet it was silent. The only reservation it raised related to the employer's exclusion. Now, when the insurance company has it in its possession, all of these facts with respect to which it now raises these myriad of other exclusions. Why would it hide its ability to raise those issues from it's insured for two years, two years until January of 2003? There was absolutely no reason. There was no discovery that needed to be taken. It had all the information. It misled it's insured throughout that period of time. It misled it's insured even before the loss. But this this misrepresentation or misleading conduct, failure to deal fairly hampered the relationship throughout. And so it's for those reasons that we would suggest that Estoppel does apply in these cases. And Waller is distinguishable because here we're dealing with the statutory regulatory obligation to advise. And the insurance company simply didn't do that. All right. Is there any questions, your honor, I would submit subject to rebuttal. Good afternoon, your honors. Jeff Bolander on behalf of Nautilus Insurance Company. I would like to begin by stating the obvious that this is a contract case. This is not a bad faith case. And under California law, the fundamental goal of contract interpretation is to interpret the policy under the plain meaning of the language to determine the mutual intention of the parties at the time of contracting. Here the undisputed evidence shows that the insurance, the applicant's broker. California is pretty liberal about allowing extraneous evidence to come in and interpreting contracts and all that. Well, that is correct. I mean, I believe that is correct when there is an ambiguity. But my understanding of the case law for insurance policy interpretation is that extrinsic evidence will only be allowed to where there is an issue as to an ambiguity in the policy or there is a question as to the reasonable expectations doctrine. And that doctrine is not looked at until there is an ambiguity. And the facts here is that worldwide the manufacturer. Things such as unambiguous insurance contracts. Well, your honor, I think there is. And I think that the modern definition of products completed operation hazard has rather uniformly been held to be unambiguous. Unlike prior versions, pre-1966 versions of that endorsement. Here the broker for worldwide, Mr. Matheson, applied for insurance and he said that to his knowledge what the insurer did was manufacture advertising balloons. And I deposed him and it is in the record. He said he never knew what their true operations were until coincidentally the very day of the accident when he happened to read an L.A. Times article. So at the time this policy was issued, it was the understanding of the broker represented worldwide and our agent and Nautilus Insurance Company that what the insurer was doing was manufacturing advertising balloons. And so we, so Nautilus issued a policy with various provisions. One of which is the exclusion for products completed operations hazard. Two was a designated premises operations endorsement. And three, an aircraft exclusion. I believe that all three of these exclusions together or independently eliminate the potential for coverage in light of the allegations against the worldwide. Now, Mr. Robbins has tried to argue here and at the district court level that legal delivery, since there was not a legal delivery, therefore there's an exception to the product completed operations hazard. And that's just not a fair reading of this exclusion. The product completed operation hazard states that a bodily injury claim falls within the hazard if it arises from the insured's product, it occurs away from the premises of the insured, except if the product is still in the physical possession of the insured. And it actually says physical possession. And case law here in California, I cited the Keenan case, specifically said that it's de facto possession. It's not whether the insured still maintains some sort of lease rights or some kind of rights in the product. It's a de facto, did the insured have possession of it at the time of the accident? Here, Mr. Robbins has argued that the insured still had some sort of physical possession of this aircraft. And the facts just don't support that. But even if you were assumed that that's correct, if the insured had physical possession of the aircraft at the time of the incident, then they were necessarily operating the aircraft at the time of the incident. And therefore, that would fall squarely within the exclusion for aircrafts. Now, Mr. Robbins has made a lot of the fact that we supposedly knew what the insured's true operations were as of January 2000. And it is true there was another accident in January 2000 inside the hangar there at the San Bernardino Airport. And the actual incident at issue in the underlying case occurred in June of 2000. And according to the record before the court, there was some sort of explosion in this hangar. At some time, I think four to eight weeks later, this was reported to Nautilus. Nautilus investigated as a property insurance claim. And the claim was not adjusted until February of 2001. So this payment that Mr. Robbins is talking about did not occur until some seven, eight months after the subject incident occurred. In terms of waiver and estoppel, that was thoroughly litigated at the district court level. There really was no competent evidence that there was ever any kind of detrimental reliance on the part of Worldwide. They're suggesting that Worldwide, if we would have notified them that we knew what they were really doing, they would have gone out and got other insurance. But there's no evidence before the court of that. I mean, competent evidence of that to create a trial issue of fact would have been that the insured could – that what the premium would have been that the insured had means to pay that. There was nothing like that. All they had was a declaration from Mr. Pasternak, the principal of Worldwide, saying something like, I might have got other insurance elsewhere. That's not enough to create detrimental reliance. And under the waiver doctrine, California law was very clear that the – And there's just no evidence at all that Nautilus waived anything. And in fact, they promptly agreed to defend Worldwide under a reservation of rights. They called it a strict reservation of rights. They specifically said, we're not waiving any other exclusions or endorsements. And so there's no evidence of waiver in this case. The appellants have tried to characterize their theories of liability in the underlying action as negligent training. Now, I've reviewed the entire record. I see no competent evidence there that we were actually training this ground crew. And I think what they're really saying is that maybe we were supposed to, but we didn't. First of all, I think that if we were training the ground crew, or we somehow had operational responsibility for this ground crew, then I think that there's a fair argument to be made that we were actually a part – Worldwide was a part of a team that was operating the aircraft. But in fact, I don't think that they really – I know they did not own the aircraft at the time of the incident. And in fact, they were not operating this aircraft at the time of the incident, because they were not training this ground crew. However, even if that was a viable theory of liability, the exclusion for designated premises and operations, there's only one reasonable interpretation of that exclusion. It says – the schedule says manufacturing risk only. And the language of the endorsement says, this insurance does not apply to bodily injury for any operations other than those in the schedule. So you look at the schedule, it says manufacturing risk only. So I submit that training an aircraft crew or ground crew is not manufacturing. That is a – manufacturing, you're producing something. Training a ground crew, that's a completely different type of operation. And also, you have to look at that endorsement in conjunction with the declarations, which describe Worldwide's operations as manufacturing advertising balloons. So the only fair interpretation of that endorsement is that coverage is limited to the on-site risk of manufacturing advertising balloons. I have nothing more to say. If you don't have any questions. Thank you. You've got 16 seconds. Your Honor, I would just point out that in addition to the loss that was paid off, the policy itself issued, and explicitly so, and it's in the record, subject to pre-policy inspection. So the insurance company should at least be held to be constructively aware of what they ultimately accepted when they paid off on the airship loss, and that is this entity was dealing with airships. And if the Court looks in the record, it will see at the pages where I've cited that in fact airship did advise its agent of the manufacturing operations it was doing. The only other thing I would point out is that California is quite liberal in its interpretation of insurance policies. One does not look at the reasonable expectations of the insured only upon an ambiguity. McKinnon, EMMI, and Hames now all recognize that the determination in the first instance of ambiguity is relegated to what would the reasonable expectation of this particular insured be under the particular circumstances of this case. And as I've indicated in the brief, under the circumstances of this case, given the way this insurance company dealt with the airship loss previously, there was a reasonable expectation that a pre-delivery accident such as this would be covered. Thank you. Well, students, I can see that you're all hungry and you want to get something to eat. And I speak on behalf, I'm sure, of the other two judges that we're glad that you're here. You're lucky to have a teacher who's interested in you and wants to see you advance in your education and is teaching you about how the country operates and how the judicial system operates. And I thought I heard as well that you're also taking a class in speaking and communication, which is very, very important. You're nodding on that. And so you have this great opportunity with this wonderful teacher, and it only takes one teacher, one teacher in your life, to change it and to get you thinking about what you're going to do in the future. And if you have one teacher, you're very fortunate. I had one teacher, and I was fortunate about that myself. So we're glad you're here, and we thank your teacher for bringing you here. And we'll take a very brief recess while you think about lunch. I don't know where you're going to eat, but sometimes we have a lunch wagon out here.
judges: Pregerson, Noonan, Thomas